OHIO STEEL BARB FENCE Co. *v.* WASHBURN & MOEN MANUF'G Co. and another.[1]

(*Circuit Court, N. D. Illinois.* March 8, 1886.)

1. SPECIFIC PERFORMANCE.
   A court of equity will not specifically enforce a contract at the instance of one of the parties who has repeatedly broken it, even if the other party has been guilty of the first breach.

2. SAME.
   If one party to a contract expects to have it specifically enforced against the other, he must act steadily in good faith, by observing its terms, whether the other party violates his covenants or not.

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

**3. SAME—REMEDY AT LAW.**

> When a party to a contract has not kept his covenants, but excuses himself on the ground that the other party was guilty of the first breach, whatever remedy there is, is at law.

In Equity.

*Sherman & Hoyt, George C. Fry,* and *George S. House,* for complainant.

*Coburn & Thacher* and *W. C. Goudy,* for defendants.

GRESHAM, J.    Prior to 1880 the defendants, as owners of certain bottom patents for barb wire fence, and machines for the manufacture of such wire, brought suits in this court against a number of alleged infringers.    In December of that year the court sustained the patents, and with one exception entered the usual interlocutory decrees against the infringers.    A large demand existed at this time for barb wire, and the defendants deemed it important to their interests that some arrangement should be made with the numerous infringers, nearly all of whom had been manufacturing, as they claimed, under patents, whereby further litigation might be avoided.    The defendants accordingly proposed that the manufacturers should abide by the decrees which had been entered against them, assign their patents to the defendants, and accept licenses for the future.    It was thought that by thus combining, a monopoly might be formed, with the defendants in control, which would be highly profitable to both the licensors and the licensees.    With one or two exceptions the manufacturers agreed to this, and accepted licenses from the defendants.

By the terms of the license which the complainant accepted on the twenty-seventh day of January, 1881, it agreed to acknowledge the validity of all the patents therein embraced; that it would manufacture and sell only such barb wire as conformed to the attached sample, and make verified monthly reports to the defendants, showing the amount manufactured and sold during the preceding month, with the names and residences of purchasers, and the terms of payment and delivery; that it would make monthly payments to the defendants at the rate of three-fourths of one cent per pound on all the barb wire it should thereafter make or sell; that the defendants might annul the license if the complainant failed or refused to comply with any of its terms; that it would not manufacture exceeding 3,000 tons of barb wire annually without the written consent of the defendants; and that it would limit itself to the use of 20 machines in its factory at Cleveland. and not manufacture elsewhere.    The defendants on their part agreed, as licensors, that they would not grant an exclusive license to any one under any of the patents embraced in the license; that they would not license any one else to manufacture or sell under the same patents at a lower royalty than three-fourths of one cent per pound, or, if they did, that the royalty to be paid by the complainant should be correspondingly reduced.

The sixth clause of the license reads as follows:

"Said Ohio Steel Barb Fence Company shall not sell barb fence wire, which it shall manufacture under this license, at a less price per pound, nor on more favorable terms of payment and delivery, than said Washburn & Moen Manufacturing Company and Isaac L. Elwood & Co. shall sell barb fence wire for use in the territory covered by this license, which they shall so manufacture; said Washburn & Moen Manufacturing Company to deliver to the said Ohio Steel Barb Fence Company, on the acceptance of this license by said Ohio Steel Barb Fence Company, a printed or written schedule of prices and terms of payment and delivery, the same to be fixed by said Washburn & Moen Manufacturing Company and Isaac L. Elwood, at which said Washburn & Moen Manufacturing Company and Isaac L. Elwood & Co. shall sell their own barb fence wire, to be used in the United States and territories, for the guidance of said Ohio Steel Barb Fence Company in the sale of the barb fence wire so made and sold under this license. And said Washburn & Moen Manufacturing Company shall give to said Ohio Steel Barb Fence Company 10 days' telegraphic and written or printed notice of any change in said prices, terms of payment, and delivery, to be fixed as aforesaid, and 10 days from date of such telegraphic notice such new schedule of prices, terms of payment, and delivery shall be followed and observed by said Ohio Steel Barb Fence Company, and by said licensor and I. L. Elwood & Co., until changed or modified again by said Washburn & Moen Manufacturing Company, as aforesaid, except as to previous agreements and orders already entered."

The license granted to complainant differed from the licenses which were granted to others in the combination, at or about the same time, only in the amount of wire which the complainant was at liberty to manufacture. The complainant and the defendants agreed upon the amount due from the former to the latter as damages for past infringements. This agreement was upon the basis of 60 cents per hundred pounds of barb wire previously manufactured, from which a deduction of 10 cents on each hundred pounds of past manufacture was made for the assignment by the complainant to the defendants of the patents under which the former had claimed the right to manufacture and sell. The defendants at the same time assured the complainant that all infringers should be required to settle on the same terms, and that all licensees should be required to pay the same royalty in the future. The complainant assigned its patents, settled for past damages, and accepted a license for the future upon the faith of this assurance, and an agreement that it should be observed. All the other infringers, except Jacob Haish, appear to have settled with the defendants on the same terms. For reasons given by the court, instead of being enjoined as were the other infringers, Haish was permitted to continue the manufacture and sale of barb wire upon paying into court from month to month amounts as royalty on a prescribed basis. He rejected all overtures looking to an adjustment, and refused to accept a license upon the terms accorded to the other unsuccessful infringers. He demanded immunity for the past, and a free royalty for the future. He was allowed a free royalty for the future upon the first 4,000 tons of manufacture, and required to pay 50 cents per hundred pounds on the next 4,000 tons, and 75 cents per hundred

pounds on the next 2,000 tons, 10,000 tons being the limit which he was permitted to manufacture and sell annually. If he was required to pay anything for past damages, the amount was trifling compared with what was exacted from the other licensees. This settlement, which did not occur until five or six months after the interlocutory decrees had been entered, was kept secret from the complainant and the other licensees. The license which Haish accepted differed from the licenses granted to others only in the amount of tonnage, but, by another instrument executed at the same time, he was entitled to a rebate which made his royalty for the future as above stated.

Unable to induce Haish to enter the combination upon equal terms with the other manufacturers, the defendants, in order to procure his patents and get him out of the way, and maintain the monopoly, admitted him on secret terms which amounted to a fraud upon the complainant and other licensees. Fearing that his longer standing out would deprive the defendants of the large revenue which they expected to derive from the monopoly, they felt constrained to concede to him terms more favorable than others enjoyed, and thus induce him to accept a license which they would not have accorded him had he been enjoined as were the other infringers. His patents and the patents which the other infringers had relied upon in the litigation had shared the same fate, and it is a mere pretense for the defendants to say that his patents were more valuable than the others, and for that reason were bought for the benefit of the other licensees, as well as for their own benefit. The defendants expressly agreed with the complainant, as they no doubt did with the other licensees, that Haish should not be permitted to enter the combination on terms which would give him an advantage over them as a manufacturer and dealer.

The evidence shows that, during much of the time after the complainant and other manufacturers became licensees, the market price of barb wire ruled lower than the schedule rates; and while it is uncertain, from the evidence, whether the complainant or the defendants first disregarded the schedule rate, there is no doubt they both violated the agreement by underselling, hoping thereby to get an unfair advantage. Authority was given the defendants to revoke the licenses of such manufacturers as sold below the schedule rate. It was the duty of the defendants to exercise this authority for the protection of licensees who kept faith with the combination, if indeed any of them kept faith. It may be that unlicensed manufacturers rendered it difficult, if not impossible to maintain the schedule rate; but however that may have been, the complainant is in no condition to insist that the monopoly shall be longer maintained. It is now in a court of equity, asking that a contract be specifically enforced which it has repeatedly broken. The complainant insists that it may do this because the defendants were guilty of the first breach. This may or may not be true, but, if true, still the complainant acted in bad faith. The evidence does not show that all the members of the combination

ignored the schedule rate, although it tends to show that fact. Such a showing would amount to an abandonment, and leave the parties as they stood before the combination was organized. The complainant not only broke its agreement, but it resorted to subterfuges to conceal sales which it made at market or other lower rates than schedule rates. This plainly indicated a purpose on the part of the complainant to take an unfair advantage of its associates in the combination, including the defendants. If the complainant expected to insist upon a specific enforcement of its agreement with the defendants, it should have steadily acted in good faith itself by observing the terms of the agreement; and this it should have done whether the defendants had violated their covenant or not.

It follows that if the complainant is entitled to any relief against the defendants it is in a court of law, and the bill is therefore dismissed.